

# NUMBER 13-16-00373-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**VICTORIA FLEMING,**                                                                 **Appellant,**

**v.**

**ISHMAEL FLEMING,**                                                                 **Appellee.**

---

### On appeal from the 146th District Court
### of Bell County, Texas.

---

# MEMORANDUM OPINION[1]

**Before Chief Justice Valdez and Justices Rodriguez and Benavides**
**Memorandum Opinion by Chief Justice Valdez**

---

[1] This case is before the Court on transfer from the Third Court of Appeals pursuant to a docket equalization order issued by the Supreme Court of Texas.  *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2017 1st C.S.).

Appellant Victoria Fleming (mother) and appellee Ishmael Fleming (father) divorced. Under the divorce decree, the trial court granted mother the exclusive right to designate the primary residence of their three-year-old son, I.F.[2] One year later, father sought to modify this arrangement, requesting that he be granted the exclusive right to designate I.F.'s primary residence due to changed circumstances. *See* TEX. FAM. CODE ANN. § 156.101 (West, Westlaw through 2017 1st C.S.). Following a bench trial, the trial court granted father's requested modification. By two issues, mother contends the trial court erred: (1) by impliedly finding that the circumstances had materially and substantially changed since the divorce decree, *see id.*; and (2) by admitting harmful evidence allegedly not disclosed to her during discovery. We affirm.

## I. BACKGROUND

The following evidence was presented at the modification hearing. Mother and father divorced in June 2014. Mother was awarded the house in which parties resided at the time of the divorce. The house was subject to a mortgage in both parents' names. Father paid child support. On top of child support, father also agreed to pay half of any daycare expenses after mother threatened to stop paying the mortgage and move to Alaska with I.F. if he failed to contribute.

At the time of the divorce decree in June 2014, mother worked at a military job during the day. Under mother's daytime schedule, I.F. attended daycare while mother worked and then spent a few hours in the evening with father before being returned to mother for the night.

---

[2] We will refer to the child by his initials throughout this opinion.

2

This arrangement changed in December 2014, when mother began working the nightshift. Under the new schedule, I.F. attended daycare during the day while mother slept and then spent the evenings and nights with father while mother worked.

In March 2015, I.F.'s maternal grandmother, Katiana Selmon, moved in with mother and I.F. Over mother's objection, father testified that he had "a lot of concerns" about this living arrangement because Selmon repeatedly used profanity and had a history of drug abuse.[3] Father elaborated:

> If she is the one that's watching him, then my first concern is that lately he has been cursing, not a lot. . . . [B]ut every time he comes to my house he says at least one cuss word a day, you know, and it's always the—one of three words. He says the word "shit" or the word "bullshit" or the word "fuck this."
>
> . . .
>
> [My other concern] is that . . . [Selmon] has had CPS take her kids away from her numerous times. Even [mother] has been removed from her home by CPS due to drugs and, you know, a bunch of other reasons. But I just know that they were removed and they had to go live with a couple of different foster parents, and this is how me and [mother] met. . . . So this is another concern that I have. If he is being watched by her mother, then I don't feel comfortable with [Selmon] watching him if she already had her kids removed from her for whatever reason.

---

[3] Specifically, mother objected to the testimony on the following ground:

| | |
|---|---|
| Mother: | Objection, your Honor. None of that was provided in discovery. We've had discovery responses and [father] answered he has no concerns about the child's present living. |
| The Court: | Well, I don't think that's an objection. I think you can raise that in your cross examination, if you wish to, but I don't believe that's an objection you can make. |
| Mother: | I don't think he should be able to testify to it if it wasn't disclosed in discovery. |
| The Court: | Well, you just told me that you asked if he had any problems with the mother and he said he did not. |
| Mother: | That the present living circumstances raised no concerns for him. |
| The Court: | Overruled. |

3

Mother testified that she had been estranged from Selmon for some time until March 2014 when Selmon reappeared in her life. Mother testified that she believed Selmon had been sober "since the early 2000s" and that Selmon became a born-again Christian. However, when pressed further on cross examination, mother testified:

Q. Was she arrested in 2012?

A. I'm not sure because we have not had that relationship like that. She just come [sic] back into my life.

. . .

Q. So how do you know she's been clean that whole time if you didn't have a relationship with her?

A. Because we have not had that closeness, but we've always stayed in touch.

Q. Are there videos on YouTube of her?

A. I'm quite sure there are.

Q. Okay. And those were from around 2012?

A. I'm not—I'm not sure, to be honest with you. I didn't—I didn't really watch them, so—

Q. Do you know what those videos are?

A. Yes, I do.

Q. What are they?

A. They are of her dancing.

Q. Was she on drugs at the time?

A. I'm not sure. I cannot tell you that.

4

When asked whether she would allow someone to babysit I.F. with a drug history without knowing how recently the person had last been on drugs or arrested, mother answered: "Everybody has a past, so I would say, yes."

From March through July 2015, I.F. continued to attend daycare during the day and spend evenings and nights with father. Around that time, mother decided to sell to father the house awarded to her in the divorce decree. After the sale, mother moved to another house with Selmon and father began making arrangements to move into the house his ex-wife sold to him.

In early August 2015, mother returned to working the dayshift at her job. With the change in work schedule came a new living arrangement for I.F. Under the new arrangement, mother took I.F. out of daycare so that Selmon could babysit the child during the day while mother worked. Mother also limited father's access to the I.F. only to days specifically permitted in the divorce decree, which generally set visitation at 6:00 p.m. the day of visitation. Mother also adopted a strict 6:00 p.m. pick up policy, which deprived father access to I.F. on his visitation days for being between one to seventeen minutes late. The denial of access occurred on several occasions, the most significant of which occurred on the eve of Thanksgiving 2015 when mother refused to release I.F. to father for the holiday because father showed up at 6:07 p.m. to pick up I.F. Additionally, mother denied father access to I.F. by claiming that I.F. was not home when, in fact, father could hear I.F. playing in the back of mother's house.

In December 2015, the trial court heard the above evidence and modified the custody order granting father the exclusive right to designate I.F.'s primary residence. This appeal followed.

## II. DISCOVERY

By her second issue, which we address first, mother contends the trial court erred in admitting evidence regarding Selmon because father allegedly failed to disclose or supplement his answers to interrogatories to state that he sought modification based on Selmon moving into mother's house.

When responding to written discovery, a party must make a complete response, based on all information reasonably available to the responding party or its attorney at the time the response is made. TEX. R. CIV. P. 193.1. If a party learns that the party's response to written discovery was incomplete or is no longer complete and correct, the party must supplement the response to the extent that the written discovery sought other information. *Id.* R. 193.5. If a party fails to make or supplement a discovery response, the information not disclosed may be excluded at trial unless, among other things, the trial court finds that the failure to respond did not "unfairly surprise" the other party. *Id.* R. 193.6(a)(2). The trial court has discretion to determine whether the proponent of the evidence met its burden to show lack of surprise. *See Bellino v. Comm'n for Lawyer Discipline*, 124 S.W.3d 380, 383–84 (Tex. App.—Dallas 2003, pet. denied). A trial court abuses its discretion if it acts in a manner that is arbitrary or capricious or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985). We will uphold the trial court's determination if the ruling has any legitimate basis. *Sierad v. Barnett*, 164 S.W.3d 471, 481 (Tex. App.—Dallas 2005, no pet.).

Here, whether or not father failed to disclose information that Selmon moved into mother's house, Selmon lived with mother during the relevant period and Selmon's

6

checkered past was no secret to mother or father. Therefore, whether or not father was required by the relevant discovery rules to supplement the information, we cannot say the trial court abused its discretion in finding that mother was not surprised by the complained-of information. *See In re E.A.G.*, 373 S.W.3d 129, 145 (Tex. App.—San Antonio 2012, pet. denied) (holding that trial court did not abuse its discretion in finding that the party was not unfairly surprised by undisclosed information of which the party was aware prior to trial); *In re M.H.*, 319 S.W.3d 137, 147 (Tex. App.—Waco 2010, no pet.) (same); *Brunelle v. TXVT Ltd. P'ship*, 198 S.W.3d 476, 480 (Tex. App.—Dallas 2006, no pet.) (finding no abuse of discretion when appellant "knew enough about [an undisclosed] witness to not be *unfairly* surprised") (emphasis in original); *see also In Interest of H.A.C.*, No. 06-16-00063-CV, 2017 WL 604064, at *4 (Tex. App.—Texarkana Feb. 15, 2017, no pet.) (mem. op). We overrule mother's second issue.

## III. MODIFICATION

By her first issue, mother contends that the trial court erred in impliedly finding there was a material and substantial change in circumstances warranting modification.

### A. Standard of Review

We review a trial court's determination regarding conservatorship for an abuse of discretion. *See Gray v. Shook*, 329 S.W.3d 186, 195 (Tex. App.—Corpus Christi 2010), *aff'd in part and rev'd in part*, 381 S.W.3d 540 (Tex. 2012). A trial court abuses its discretion if its decision is "arbitrary or unreasonable" or if it "fails to analyze or apply the law correctly." *Id.* The trial court does not abuse its discretion if "there is some evidence of a substantive and probative character to support the decision." *Id.* "Under an abuse-of-discretion standard, legal and factual insufficiency are not independent grounds of

7

error, but rather are relevant factors in assessing whether the trial court abused its discretion." *Id.* "[W]e engage in a two-prong analysis [under our abuse of discretion standard]: (1) whether the trial court had sufficient information upon which to exercise its discretion; and (2) whether the trial court erred in its application of discretion." *Gardner v. Gardner*, 229 S.W.3d 747, 751 (Tex. App.—San Antonio 2007, no pet.). Evidence is legally insufficient if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *See Danet v. Bhan*, 436 S.W.3d 793, 797 (Tex. 2014) (citing C*ity of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex. 2005)). Evidence is factually insufficient if the evidence that supports a vital fact is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

## B. Applicable Law

In a suit to modify the parent-child relationship, the petitioner must establish the modification sought would be in the best interest of the child and that "the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the . . . the date of the rendition of the order[.]" TEX. FAM. CODE ANN. § 156.101.

> In deciding whether a material and substantial change of circumstances has occurred, a fact finder is not confined to rigid or definite guidelines; instead, the determination is fact specific and must be made according to the circumstances as they arise. Material changes may include (1) the marriage of one of the parties, (2) poisoning of a child's mind by one of the parties, (3) change in the home surroundings, (4) mistreatment of a child by a parent or step-parent, or (5) a parent's becoming an improper person to

exercise custody. . . . A material and substantial change in circumstances may be established by either direct or circumstantial evidence.

*Arredondo v. Betancourt*, 383 S.W.3d 730, 734–35 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citations omitted).

Additionally, "a course of conduct pursued by a managing conservator that hampers a child's opportunity to favorably associate with the other parent may suffice as grounds for redesignating managing conservators." *Id.* at 735; *see Epps v. Deboise*, 537 S.W.3d 238, 246–47 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (holding there was a material and substantial change warranting modification when mother consistently denied father access to and information regarding the child, thereby interfering with father's right to spend time and bond with the child).

Finally, the fact that a custodial parent must work to make a living and must employ a babysitter to watch the child does not justify a change in circumstances warranting modification where there is no evidence that the babysitter chosen by the custodial parent is an improper person or otherwise abusive or neglectful to the child. *See Heiskell v. Heiskell*, 412 S.W.2d 774, 776 (Tex. Civ. App.—Amarillo 1967, no writ).

C.    Analysis

Mother asserts that there was no evidence that circumstances materially and substantially changed since the time of the divorce decree and that, if anything, the evidence conclusively established that the same circumstances existed as they did at the time of the divorce decree. Specifically, mother points out that she worked the same daytime schedule at the time of the divorce decree as she did at the time of the modification. It is true that mother returned to the daytime shift. However, mother overlooks that the circumstances had changed in other respects. Mother sold the house

9

in which she and I.F. lived to father; Selmon moved in with mother without mother knowing how long it had been since Selmon last did drugs or was arrested; mother removed I.F. from daycare and allowed Selmon, who routinely uttered profanities, to assume the role of I.F.'s babysitter; and mother implemented a strict 6:00 p.m. pick-up schedule on father's visitation days, which interfered with father's right to spend time and bond with I.F. Given the evidence of these changes, we conclude the trial court had sufficient information upon which to exercise its discretion to grant the requested modification based on a material and substantial change in circumstance and that the trial court properly applied its discretion in this case. *See* TEX. FAM. CODE ANN. § 156.101; *see also Epps*, 537 S.W.3d at 246–47; *Arredondo*, 383 S.W.3d at 734–35; *Heiskell*, 412 S.W.2d at 776. We overrule mother's first issue.

## IV. CONCLUSION

We affirm the trial court's order granting father the exclusive right to designate I.F.'s primary residence.

/s/ **Rogelio Valdez**
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
27th day of July, 2018.

10